UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x

STEVEN AMMANN,

                         Plaintiff,

                     v.

SHARESTATES, INC. and ALLEN SHAYANFEKR, in his capacity as Employer,

                     Defendants.

------------------------------------------------------------------------x

Case No.

**COMPLAINT**

**JURY TRIAL DEMANDED**

**ECF CASE**

Plaintiff Steven Ammann, by his attorneys, Parker Pohl LLP, as and for his Complaint against Defendants Sharestates, Inc. (“Sharestates” or the “Company”) and Allen Shayanfekr in his capacity as employer, alleges as follows:

## NATURE OF THE CASE

1.      Sharestates is a New York-based real estate lender that makes money primarily by selling the loans it originates to institutional investors. The Company hired Steven Ammann to perform a critical, core job: find those investors. The Company promised to compensate Ammann on a commission basis, calculated as a percentage of loan sale revenue.

2.      Ammann and Sharestates had a deal – in writing, signed by both parties. It states clearly what Ammann would do for the young Company, and how it would pay him. Ammann worked tirelessly pursuant to that agreement. Within a year, he had secured numerous, lucrative investor-relationships and a transformative line of credit that, together, increased the Company’s monthly loan sales from around $10 million to $50 million.

3.      The Company and its CEO, Allen Shayanfekr, happily accepted the tremendous value that Ammann *undisputedly* brought to the table.

4.      But greed set in. Shayanfekr said the Company was paying Ammann “too much.”

5.      So Defendants began trying to weasel out of the deal they made. Through a variety of disingenuous stances, Shayanfekr sought to chip away at, and justify deductions from, Ammann's contractually-mandated compensation. In one move after another, Shayanfekr unilaterally declared that Ammann would no longer receive commissions on certain servicing fees or loans, notwithstanding that Defendants agreed in writing that he would. And while the parties' agreement entitles Ammann to a 10% commission on all loans using the line-of-credit he secured, Shayanfekr one day decided that Ammann would receive only 2%.

6.      Ammann knew, each time Defendants unilaterally modified the terms of his employment, that it was a breach of contract. That is because the agreement states point-blank: "No changes or modifications or waivers to this Agreement will be effective unless in writing and signed by both parties." None of Defendants' modifications is in a writing signed by *either* party.

7.      Moreover, none of Defendants' improper modifications of the contract came with any consideration or benefit to Ammann. His job remained exactly the same – he just got paid less.

8.      But, as Defendants knew full well, Ammann needed the paycheck. So, to avoid confrontation, he went along with it and kept working notwithstanding their blatant breaches.

9.      But in so doing, Ammann never intended to waive, nor did he waive, his bargained-for rights to enforce the parties' written agreement, if only because the agreement also contains a no-waiver clause stating: "The failure of either party to enforce its rights under this Agreement at any time for any period shall not be construed as a waiver of such rights."

10.     In wrongfully reducing and withholding Ammann's commissions, Defendants' conduct not only breached the contract, but also violated provisions of New York Labor Law governing wrongful deductions from wages and the withholding of earned commissions. Indeed, the Labor Law is intended to deter precisely this kind of employer bullying and over-reaching.

11.     Moreover, while Defendants have taken the position that Ammann was an independent contractor and not an employee, this is a textbook case of worker misclassification. Aside from the fact that the agreement expressly states that, "[f]or purposes of clarity, [Ammann] is engaged in the performance of the Services as an 'at will' employee" (while baselessly labeling him an independent contractor elsewhere), Ammann was hardly a consultant in some ancillary role: his work finding investors to purchase Sharestates's loans went to the *very core* of the Company's business. In fact, as Shayanfekr told the Company's biggest borrower in March 2017, Ammann was one of the Company's "best guys."

12.     Moreover, as demonstrated below, Defendants plainly exercised control over the results of Ammann's work and the means used to achieve them, as myriad facts and circumstances of Ammann's employment make clear. In fact, his job was *no different* from other employees who were expressly classified as W-2 employees. He performed the very same job, and the Company did not treat him differently in any material way.

13.     In accordance with well-established law and express provisions of New York Labor Law, Steven Ammann brings this action against Sharestates and its CEO, Allen Shayanfekr, seeking to recover all unpaid commissions and other damages. Ammann has to date been unable to obtain an accurate accounting of the earned commissions he is owed because the Company's reports have been consistently inaccurate and riddled with errors and omissions. He has, moreover, been deprived of the disclosure necessary to verify actual loan sales and third-party expenses, and thus he has been unable to reconcile the Company's proffered calculations. After several demands for this basic information, Ammann is left with no choice but to commence this suit.

## PARTIES

14.     Plaintiff is a resident of Florida with an address at 100 Brickell Bay Drive, Apt. 71D, Miami, Fl 33131.

15.     Defendant Sharestates is a Delaware Corporation and registered New York Foreign Business Corporation. The Company's principal place of business is 45 North Station Plaza, Suite 400, Great Neck, NY 11021. The Company was Ammann's "employer" within the meaning of Labor Law § 190(3).

16.     Defendant Shayanfekr is a resident of Roslyn Heights, New York, and is the CEO and co-founder of Sharestates. He is a self-described "entrepreneur with cross-functional expertise in real estate, law, technology, and finance." He has a law degree and a background in securities, regulation, and compliance.

17.     Shayanfekr meets the definition of "employer" under Labor Law § 190(3) and is sued in his capacity as Ammann's employer. He has an ownership interest in the Company, exercised control of Sharestates's day-to-day operations and functions, hired and fired employees, and determined the methods and rates of pay. Shayanfekr has at all relevant times run the Company and was the decision-maker with respect to the matters at issue in this action.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a) because Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000.

19.     Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. §§ 1391(b) and (c) because a substantial part of the events or omissions giving rise to this action, including Defendants' unlawful employment practices alleged herein, occurred in this district.

## FACTS

### Mr. Ammann's Background

20.     Steven Ammann graduated from SUNY Albany in 2008 with a bachelor's degree in Business Administration, concentration in Finance.

21.     He immediately went to work for the investment bank Nomura as an analyst in its asset manager division in Manhattan. In around mid-2009, he moved to a better position at Nomura as a real estate loan and bond salesman. There, he became the mortgage desk's top-selling associate.

22.     In 2012, Ammann left Nomura to become a real estate loan and bond salesman at ICAP, a broker-dealer in Jersey City.

23.     In 2014, Ammann left ICAP to join Angel Oak Securities. Ammann helped the company's real estate lender sell loans to investors. He remained at Angel Oak until 2016 when, as described below, he joined Sharestates.

24.     During his eight years of experience before joining Sharestates, Ammann developed valuable relationships with numerous institutional investors. These relationships would prove key to his success at Sharestates.

### Mr. Ammann Joins Sharestates, on a Commission Basis, to Facilitate Loan Sales

25.     In April 2016, Ammann joined Sharestates on a commissioned basis in its Capital Markets department. At the time, he and the Company had no written agreement.

26.     His job was no different than other Capital Markets employees: to facilitate sales of the Company's loans to institutional investors. His job was to introduce potential investors that would purchase loans originated by Sharestates. Upon that initial interest, Ammann was to get a Non-Disclosure Agreement in place to enable the investor to conduct due diligence on its potential investment. In that due diligence process, Ammann provided investors with a variety of Company

materials – including Sharestates's standard deck, historical loan file, loan program underwriting file, loan servicing file, etc. – all of which were created by the Company and given to Ammann.

27.     This onboarding process was meticulous and labor-intensive and took several months from start to finish. Even after a Master Loan Purchase Agreement was in place and loans were sold to the investor, commissions were not paid for some time thereafter.

28.     The Company understood that Ammann would need time to ramp up sales and, moreover, that his work for Sharestates was his only employment and source of income.

29.     Thus, the Company agreed at or around the commencement of his employment to pay Ammann a nonrecoupable $2,500/week draw-on-commissions.

30.     As explained below, however, Ammann quickly developed a strong pipeline of sales for the Company and, by the end of 2016, his commissions began to exceed the weekly draw. As a result, he and Sharestates agreed that he would no longer receive the draw.

**The Parties' Written Agreement**

31.     Beginning shortly after his employment with Sharestates started in April 2016, Ammann expressed his desire to have a written agreement governing the terms of his employment. By January 2017, despite repeated requests, he still had no agreement.

32.     In January 2017, Shayanfekr's lack of concern was clear. He wrote to Ammann: "we'll have it signed soon LOL."

33.     Finally, in March 2017, the parties entered a written agreement, effective September 1, 2016 (the "Agreement").

34.     The Agreement states that Ammann was hired to provide "Services related to the generation of loan purchase agreements" and that he "shall be compensated for the duration of his *employment* with Company by Monthly Commission." (Agreement, Exhibit A (emphasis added)) The "Monthly Commission shall be calculated at a rate of ten per cent (10%) of gross revenues

("Gross Revenues")" derived from loans sold to his investors. *Id*. "Gross Revenues" included *all* "origination and servicing points net of broker fees and 3rd party servicing fees." *Id*.

35. Ammann was to receive these commissions "in connection with loan purchases executed by the investors introduced to Company" *in perpetuity*; indeed, he was to receive commissions on sales "even if [he] is no longer in the employ of Company." *Id*.

36. The Agreement also referenced a "warehouse line (debt facility)." *Id*. A warehouse line is essentially a revolving line-of-credit providing the Company with capital to fund its loans.

37. Ammann secured Sharestates a 100% warehouse line, which was extremely valuable to the Company because it enabled it to fund loans without any equity of its own – the Company could draw on the warehouse line to fund a loan and then, upon selling the loan to an investor, use the sale proceeds to pay down the line. This capability vastly increased Company revenues, as its capacity to generate fee-producing loans skyrocketed.

38. Of course, Ammann was to be compensated for securing the Company's warehouse line. The Agreement provided that, in addition to receiving 10% of Gross Revenues on loans sold to investors he introduced, Ammann was entitled to 10% of Gross Revenues on sales utilizing the warehouse line he introduced, regardless of whether he had introduced the buyer. *Id*.

39. The parties agreed that, when Ammann's warehouse line was used to fund a loan *and* the loan was subsequently sold to one of his investors, he would not receive a commission on *both* the warehouse-line and the sale. The Agreement stresses: "For clarity, the maximum Commission paid by the Company of Gross Revenue shall not exceed ten percent (10%)." *Id*.

40. The parties agreed, moreover, that Ammann's commissions would be paid on the 15th day of the month after the month in which they were earned.

41. The Agreement contained a non-compete clause stating that, during his employment:

> [Ammann] will not engage in any activity, other than on behalf of Company, consisting of the procurement of investors and other

ancillary services in conjunction with the establishment of loan purchase agreements by and between the Company and said investors.

*Id.*, § 2.3.

42.     The Agreement contains a no-waiver clause stating: "The failure of either party to enforce its rights under this Agreement at any time for any period shall not be construed as a waiver of such rights." *Id.*, § 8.

43.     The Agreement also contains a no-oral-modification clause stating: "No changes or modifications or waivers to this Agreement will be effective unless in writing and signed by both parties." *Id.*, § 8.

44.     Notably, the Agreement states, "[f]or purposes of clarity, [Ammann] is engaged in the performance of the Services as an 'at will' employee," *id.*, § 4, while also stating that "each party shall be . . . an independent contractor," *id.*, § 5.

**Mr. Ammann was a Highly Successful Employee – One of the Company's "Best Guys"**

45.     Ammann indisputably added immense value to the Company. At the time he joined Sharestates, its monthly production had stalled at approximately $10 million in originations and, within a year, he had secured investors that increased it to over $50 million.

46.     Indeed, Sharestates was relatively small when Ammann joined in April 2016. In around May 2016, Ammann introduced the Company to its first billion-dollar investor, Magnetar Capital. He introduced the Company to other billion-dollar-plus funds that, at times, bought over $100 million a month in loans from other lenders. He secured other major investors, including but not limited to 1Sharpe Capital and Verus Mortgage Capital.

47.     The Company's growth and its developing track record made it attractive to larger institutional buyers who, when Ammann joined the Company, never would have considered purchasing loans from the small company. For example, once Sharestates had grown sufficiently,

Ammann secured a lucrative relationship with Neuberger Berman, an investment management firm with hundreds of billions of dollars under management.

48. In fact, at each stage of Sharestates's growth, it was Ammann who introduced the Company to its then-biggest investor. He introduced around 17 investors in total, and his work resulted in up to $68 million in sales each month.

49. Moreover, as noted, Ammann secured the Company's 100% warehouse line, a crucial resource without which the Company never would have grown as it has.

50. Ammann also single-handedly designed the Company's term-loan program. As opposed to short-term bridge loans that yield higher interest rates but have certain risk, term loans offer long-term (often 30-year) investments with a safer risk profile, but lower interest rates. In fact, it was Ammann who, after researching the idea and formulating the concept, proposed a term-loan program to Shayanfekr in the first place.

51. Shayanfekr was interested. He responded "that's awesome" on August 17, 2016, and Ammann then introduced the Company to its first term-loan buyer, Verus Mortgage Capital.

52. As a direct result of the term-loan program that Ammann devised and implemented, the Company has built a substantial track record writing term loans and earned millions in revenues.

53. Shayanfekr knew well that Ammann was key to the Company's success. Shayanfekr told the Company's biggest borrower in a March 24, 2017 email: "Steve is one of our best guys."

**The Company's Pattern of Disregard for Mr. Ammann's Earned Commissions**

54. Ammann worked tirelessly for the Company expanding its investor base, increasing its loan capacity, and developing its products. Yet, from nearly the beginning, the Company showed a remarkable disregard for its obligations to Ammann under the Agreement.

55. In order to meet the agreed-upon deadline for commission payments, the Company was to provide Ammann, at or around the end of each month of his employment, an Excel file

intended to: (a) summarize all sales to his investors and all warehouse-line sales in the prior month; (b) indicate all origination and servicing fees on which his commissions were calculated; and (c) provide other information relevant to a calculation of his earned commissions. The Company was consistently late in providing this information.

56.    More troubling, however, the Company's monthly spreadsheets were riddled with inaccuracies, omissions, and errors that substantially impacted the calculation of Ammann's earned commissions. Not surprisingly, the errors almost always resulted in understating his compensation.

57.    As reflected in email after email, the Company's accountant acknowledged errors in the spreadsheets and corrected them only after Ammann was required to explain them. The Excel files often omitted certain loans together and understated origination or servicing revenues. The files reflected information inconsistent in other key respects with information otherwise available to Ammann, including directly from the employees who actually originated the loan.

58.    The following are just a few examples:

- Emails from early June and July 2017 show Ammann objecting to missing loans and origination income. The Company's accounting employee, Jackie Salter, responded that one report should be "more accurate now" and, as for the other: "Sorry about that! I should have double checked those."

- September 2017 emails show Ammann identifying *15 errors* concerning servicing fees in the August report. Shayanfekr stated he was "looking into what caused this."

- March 2018 emails show Ammann identifying *seven missing loans* on the February report. Salter responds: "Yes you're right! Please see updated report attached."

- April 2019 emails show the accounting department admitting it "missed this whole section" of loans. Ammann objected to delays in providing information, stating that "[t]his clearly is at the bottom of priority every month and is very frustrating." Shayanfekr responded confirming that other "items" were "more important."

59.    Shayanfekr routinely downplayed the accounting issues, which directly harmed Ammann and cost him money. Shayanfekr called them just "bugs in the report." Other times, the Company cited "complicated accounting."

60.     The frequent errors in the Company's reporting resulted, at best, from incompetent management and accounting. Or at worst, they reflected a purposeful effort to deprive Ammann of his earned commissions.

61.     To this day, Ammann lacks a full, reliable accounting of his earned commissions, as he has at no time been provided with information necessary to reconcile the fees Sharestates claimed it was earning or the significant third-party fees the Company claimed it was incurring and using to reduce the basis on which Ammann's commissions were calculated.

62.     Compounding the many accounting errors, the Company regularly ignored the agreed-upon payment deadlines in the parties' Agreement, with some payments being multiple months late, reflecting a blatant disregard and wholly cavalier approach to the Company's obligations under the Agreement and New York Labor Law.

63.     In fact, as of the date this Complaint is filed – May 17, 2021 – the Company has not paid Ammann any April 2021 commissions or even sent him the Excel spreadsheet covering April.

**The Company Repeatedly, Without Consideration, Changes its Agreement with Ammann**

64.     Upon information and belief, despite benefiting enormously from Ammann's work, Defendants came to regret having promised to pay him a 10% commission on all fees derived from sales to his investors and a 10% commission on all sales using his warehouse line. As Shayanfekr complained in a July 31, 2019 email, Ammann had become "the single highest paid resource in our company." The Company was paying Ammann "too much," Shayanfekr said.

65.     But of course, Sharestates needed Ammann. His role was integral to its operations and, after all, his investors accounted for a substantial portion of the Company's revenues.

66.     Defendants just didn't want to pay him what they had agreed, in writing, to pay.

67.     So, Defendants sought to chip away unilaterally at Ammann's compensation arrangement. Each such unilateral modification to the terms of Ammann's employment was without

consideration, as the Company still expected him to perform the very same job. None of these modifications to the Agreement is reflected in a writing signed by both parties as required by Section 8 of the Agreement. Each violated the Agreement.

68.     One example involved borrower servicing late fees. Such servicing late fees are just another form of servicing fees and, of course, servicing fees are expressly within the definition of "Gross Revenues," on which Ammann's commissions are calculated under the Agreement.

69.     In the early years of Ammann's employment, he was paid commissions on *all* servicing fees, including servicing late fees.

70.     However, beginning in or around 2017, Shayanfekr informed Ammann that the Company would no longer pay him commissions based on late servicing fees.

71.     Another example of Defendants' improper modifications involved third-party servicing fees – fees earned by the Company by remaining the servicer, in a limited capacity, on a loan after selling it to an investor.

72.     Like borrower servicing late fees, the Agreement does not exempt third-party servicing fees from its definition of "Gross Revenues." And again, at first, Ammann was paid commissions on such third-party servicing fees.

73.     But in or around mid-2019, Shayanfekr declared the Company would no longer pay Ammann commissions on third-party servicing fees each month, which Shayanfekr said were a "nuisance." Contrary to the parties' Agreement, Shayanfekr declared Ammann would receive these earned commissions at a later time. Not only was such a delay in paying these earned commissions plainly illegal, the Company ended up never paying some of these commissions at all.

74.     Another example of Defendants' improper modifications involved so-called "second sales." In sum and substance, Sharestates sold some loans to retail investors while retaining the right

to resell them to an institutional investor. The Company did this on occasion and sold some such loans to Ammann's investors.

75.     Notwithstanding that Ammann is entitled to commissions on *all* "loan purchases executed by the investors [he] introduced to Company" (Agreement, Exh. A), Shayanfekr declared in around March 2020 that the Company would not pay commissions on those second sales.

76.     When Ammann stood up for himself and objected to the Company's refusal to pay commissions on loans sold to *his investors* as the Agreement required, Shayanfekr dismissed him on March 5, 2020, saying "everything is always an argument with you."

77.     In another example of Defendants' blithe willingness to ignore the parties' Agreement, on April 14, 2020, Shayanfekr informed Ammann that the Company would simply withhold payment of certain commissions admittedly earned "for 60-90 days". As his proffered justification for this refusal to pay earned wages, Shayanfekr labeled the loans at issue as potential "early payment default" loans – loans that might conceivably go into default after being sold, and thus be sold back to Sharestates under its agreement with the buyer.

78.     Again, nothing in the Agreement – and certainly not in the Labor Law – entitled the Company to withhold any monthly commission owed to Ammann for any such reason.

79.     Defendants' most damaging unilateral modification to the terms of the Agreement came in 2018 when Shayanfekr declared that Ammann must accept a reduction in his commissions on warehouse-line sales from 10% to 2%. In their discussions, Ammann protested this drastic reduction in his compensation and plain breach of the Agreement.

80.     To avoid a confrontation that might jeopardize the job he needed, however, Ammann decided not to enforce his contractual right to 10% of all warehouse-line sales at that time, and to go along with Shayanfekr's improper modification. But to be sure, Ammann always believed (correctly) that the Company's unilateral change to the Agreement was a blatant breach.

81.   In going along with this improper, purported modification of the terms of the Agreement, Ammann did not waive his rights to enforce the Agreement. Of course, the Agreement expressly says as much. (*See* Agreement, Section 8 ("The failure of either party to enforce its rights under this Agreement at any time for any period shall not be construed as a waiver of such rights.")

82.   In fact, at the time Defendants made each of the above-mentioned unilateral modifications to the Agreement (*see above*, ¶¶ 67-81), Ammann believed (correctly) that they were plain breaches of the parties' Agreement and he in no way intended to waive, or did waive, his rights to enforce the Agreement.

83.   Indeed, Ammann desired to continue earning his compensation as promised under the parties' Agreement, notwithstanding Defendants' repeated disregard of the bargain.

84.   Moreover, each of Defendants' improper modifications of Ammann's employment, as highlighted herein, was effected without consideration. None of Ammann's job duties or obligations was eliminated or lessened in any way, nor did he receive any other benefit. His job remained exactly the same – he just got paid less.

85.   None of the above-mentioned, purported modifications to the parties' Agreement is in writing and signed, thus rendering each one ineffective under the express terms of the Agreement. (*See* Agreement, § 8 ("No changes or modifications or waivers to this Agreement will be effective unless in writing and signed by both parties.")

86.   Ammann has at no time waived any of his rights under the Agreement.

87.   Despite his repeated demand for disclosure from the Company as to all information necessary to calculate the amount in earned commissions he is owed under the Agreement, the Company has refused to provide it. Thus, Ammann lacks information sufficient to calculate the exact amount of commissions he is owed as a result of Defendants' wrongful conduct. However, the

wrongful deduction in warehouse-line commissions from 10% to 2% alone has resulted in $787,081.52 due and owing up to October 2020.

**Defendants Repeatedly Try, and Fail, to Secure a New Written Agreement with Ammann**

88.     Defendants were clearly at all times aware that their purported modifications of the Agreement needed to be in writing, signed by both parties, in order to be effective. In fact, they tried *twice* to get Ammann to sign such an amendment agreement. He refused both times.[1]

89.     Defendants' first attempt to replace the parties' written Agreement came on May 28, 2019, when Shayanfekr sent Ammann a proposed amended agreement. This proposed agreement differed from the existing Agreement in several critical respects. For one, the parties' existing Agreement states that, "[f]or purposes of clarity, [Ammann] is engaged in the performance of the Services as an 'at will' employee." *Id.*, § 4. This May 2019 proposed agreement omitted that line and, in a "Whereas" clause, stated that Ammann "will provide the Company with consulting services as an independent contractor with respect to the Business of the Company." (p. 1)

90.     Defendants also sought to obtain the one-year non-compete that Ammann had refused to sign in August 2018 (*see* the footnote immediately below). The May 2019 proposed amended agreement, if signed, would have prohibited Ammann, "for a period of one (1) year after" leaving the Company, from:

> Attempt[ing] to solicit, contact, or conduct any business with any of Company's clients (or their affiliates) or engag[ing] in any other business or conduct any other similar activity with any client, customer or business contact of Company (or any of their respective affiliates) with whom Consultant had contact or learned about while

---

[1]     Prior to its first proposed amended agreement, Defendants on August 24, 2018, tried to get Ammann to agree to an additional non-compete restriction. The Company sent him (and the other employees) a PDF entitled "Sharestates – Form Employee PIIA" that contained a burdensome, one-year non-compete. It stated, moreover, that its terms "supersede the terms of any similar form that I may have previously signed." This additional non-compete did not bestow any benefit upon Ammann. He did not sign it.

Consultant was providing services to Company in a manner that could reasonably adversely affect the Company.

(Section 7)

91.     Of course, had Ammann agreed to that restrictive covenant, he would be barred from doing business with the very investors that he spent eight years creating relationships with and bringing to Sharestates, and who were critical to his ability to make a living.

92.     Incredibly, this new May 2019 proposed amended agreement then purported to *eliminate his warehouse-line commission altogether* by omitted any reference to it (*see* Schedule 3(a)) and stating that this new agreement "supersedes any and all prior discussions, agreements and/or understandings between the parties, including without limitation, all understandings between the parties" (§ 11).

93.     Of course, nothing in this proposed amended agreement, which only diminished Ammann's earning potential as compared to the existing Agreement, benefitted Ammann.

94.     He refused to sign it, choosing instead to leave the existing Agreement in place.

95.     On December 3, 2020, Defendants again tried to get Ammann to sign an amended Agreement. This one also omitted the provision from the existing Agreement stating that, "[f]or purposes of clarity, [Ammann] is engaged in the performance of the Services as an 'at will' employee." *Id*., § 4. The new proposed agreement stated instead, in a "Whereas" clause, that Ammann "will provide the Company with consulting services as an independent contractor." (p. 1)

96.     The December 2020 proposed amended agreement also, like the previously rejected May 2019 proposed amended agreement, purported to eliminate Ammann's commission on warehouse-line sales entirely. (*See* Schedule 3(a))

97.     Yet this December 2020 proposed agreement contained an even more drastic departure from the existing Agreement. Whereas the existing Agreement expressly provided that Ammann would receive commissions on loans sold to his investors "even if [he] is no longer in the

employ of Company" (Agreement, Exh. A) the proposed amendment provided that such payments would end "six (6) months after" he resigned or was terminated "for cause" (*see* Schedule 3(a)).

98.     Despite proposing these major departures, Shayanfekr obtusely wrote to Ammann: "I don't think anything here is an issue."

99.     Ammann refused to sign that proposed amended agreement as well, choosing instead to leave the parties' existing Agreement in place.

100.     Defendants' efforts to obtain a signed, written amendment to the parties' Agreement confirms their understanding that, as the Agreement states, "[n]o changes or modifications or waivers to this Agreement will be effective unless in writing and signed by both parties." *Id.*, § 8.

**Defendants' Disregard for Ammann and the Parties' Agreement Reaches a Breaking Point**

101.     By early 2020, after years of working tirelessly for Sharestates, the relationship between Ammann and the Company had started to sour. He could no longer tolerate Defendants' improper deductions from his compensation while reaping the benefits of his continued high level of performance.

102.     The breaking point became imminent when, in January 2020, Ammann caught Shayanfekr in a lie while he was trying to justify another purported modification to the Agreement involving Ammann's commission on sales of term loans – the very product Ammann had designed – to his investors. In particular, Shayanfekr claimed that the Company had obtained offers from Credit Suisse and Blackstone that were better than the current deals with Ammann's investors, and that the only way the Company could justify continuing to sell term loans to Ammann's investors would be if he reduced his commission on term-loan sales from 10% to 5%. But when Ammann informed Shayanfekr that other employees confirmed that Credit Suisse and Blackstone were in fact *not* buying term loans, Shayanfekr walked back his prior claim.

103. Indeed, Shayanfekr simply was not being honest with Ammann, and plainly would resort to any tactic to chip away improperly at Ammann's contractually-mandated compensation, while continuing to benefit from his services to Sharestates.

104. In that connection, Shayanfekr also authorized another Capital Markets employee to circumvent Ammann vis-à-vis a particular investor in an attempt to avoid paying him commissions on loans sold to that investor.

105. Meanwhile, Ammann had grown increasingly concerned that Defendants were engaged in other conduct in reckless disregard of the Company's obligations to him.

106. For one, it became clear to him that the Company was selling a disproportionate amount of "bad" loans, i.e., loans with flawed fundamentals or understated risks, to investors he had introduced, while selling "good" loans to other investors. Indeed, the Company began originating certain high-risk loans knowing it could sell them to Ammann's investors for a quick return. Not surprisingly, this short-sighted tactic had a foreseeably damaging impact on the long-term investor relationship, which Ammann had worked so hard to develop. And of course, the viability of these relationships was key not only to Ammann's compensation, but also his reputation. The Company's conduct was in bad faith and in violation of its duty of good faith to Ammann.

107. Ammann also developed serious concerns that the Company had begun misrepresenting information to other investors as well, including those he introduced, regarding the underlying fundamentals of certain loans. Such misrepresentations involved related-party transactions, as well as preferential rates given to personal contacts.[2]

---

[2]     The Company's practice of selling loans secured with inflated appraisals has recently been the subject of press reports. *See* https://westfaironline.com/135007/135007/. That article concerns Pallasite, a fund owned by Magnetar Capital, which is an investor that Ammann introduced to the Company.

108.    Defendants knew or should have known, at the time the Company engaged in these improper practices, that doing so was likely to have a damaging impact on Ammann's reputation.

109.    Defendants' conduct was in bad faith, and inconsistent with its implied duty of good faith and fair dealing under the parties' Agreement.

110.    In December 2020, after the Company had again tried to change Ammann's contract, he retained counsel to assist him in obtaining all earned commissions he is owed. Yet, in response to his attorney's demand letter, the Company retaliated against him by withholding *all* of his earned commissions from November 2020 on, *even commissions the Company admitted he was owed*.

111.    This illegal tactic was an obvious attempt to gain leverage over him. According to the Company, its retaliatory conduct was justified because Ammann had become "adversarial."

112.    In April 2021, after repeated demand from Ammann for payment of the earned commissions that the Company acknowledged he was owed but refused to pay, the Company finally relented and paid certain commissions earned in November 2020 – March 2021. Of course, the Company paid only a 2% commission on warehouse-line sales during that period, and Ammann expressly reserved his right to pursue the full 10% required by the parties' written Agreement.

**Sharestates Misclassified Mr. Ammann as an Independent Contractor**

113.    While he worked for Sharestates, the Company improperly classified Ammann as an independent contractor when, in fact, he was an employee.

114.    Ammann had no *independent* business operation while working for Sharestates.  His work – day in and day out – was in furtherance of *Sharestates's* business.

115.    Ammann's work finding institutional loan investors was undisputedly an integral part, and goes to the *very core*, of Sharestates's business. He was not, for example, an IT consultant brought in to set up computers for the Company's loan salesmen; he was not an HR consultant tasked with running the benefits packages for the Company's employees. Instead, Ammann was a

key employee for the Company – one of its "best guys," as Shayanfekr said – who worked tirelessly to build the very heart of what Sharestates was founded to do: sell loans to investors.

116.     Moreover, far from being an independent contractor free to take other projects at will, Sharestates expressly *barred* Ammann from any such other work. Indeed, the Agreement's non-compete provision (§ 2.3) *prohibited* Ammann from working elsewhere in the parties' industry.

117.     In 2018, Shayanfekr expressly admonished Ammann not to be "sourcing debt capital providers for other lenders."

118.     Defendants undisputedly had *complete* control over the results of Ammann's work, including but not limited to because they had the power to accept or reject any investor he introduced and full discretion as to which investors to sell loans to, and what warehouse line to use.

119.     The Company also controlled the means Ammann used to achieve his results.

120.     The Company provided Ammann with an @sharestates.com email address and business cards. Not only did Sharestates give him an email address, it monitored his emails.

121.     Sharestates instructed Ammann as to Company onboarding procedures and protocols, and required him to use company-provided materials and documents, including for example the Company's NDA, its pitch deck, loan file, loan program underwriting guidelines, and loan program servicing guideline.

122.     He was required to provide regular reports, including a "Cap Markets Spreadsheet" that he was required to complete in advance of weekly Cap Markets meetings, which he (along with the other employees) was required to attend. He was also required to participate in a weekly "Sales Pipeline Call" with the other employees.

123.     He was included on, and contributed to, email chains with executives and other employees concerning core Company business matters. For example:

- On July 18, 2017, Shayanfekr sent an email entitled "Weekly Reports" to three employees, including Ammann, in which Shayanfekr was "following up" on certain "weekly reports/updates" he had requested but not received, and stating: "Please don't make me do that."

- On February 26, 2020, in preparation for a Company board meeting, Shayanfekr sent an email to the "Team" – including Ammann and four other "Account Manager" employees – regarding their "individual targets" and putting together a "master list" and "short blurb as to where we stand with each one in terms of process."

- On February 14, 2018, Shayanfekr sent an email to five employees, including Ammann, asking them to "create one master list of all of Our loan buyers," and to have it "done by Friday."

124. In fact, Ammann was made privy to all types of details of Sharestates's internal business, including the different arrangements the Company had with different investors, i.e., different pricing, terms, and premiums, and the status of ongoing negotiations between the Company and its most important investors (only some of which Ammann introduced).

125. Ammann received countless additional emails that the other employees also received, including regarding Company meetings, benefits, and outings. When the Covid-19 Pandemic hit in February 2020, Ammann received company-wide emails, with the subject heading "TO ALL EMPLOYEES – IMPORTANT PLEASE READ", concerning safety measures.

126. The Company in all material respects treated him just like any other employee.

127. In fact, Ammann's job was materially identical to other Sharestates employees, Kevin Shane and Jenine Fitter – they had the very same job, and they were both *expressly classified as employees*. And to be sure, Shane (like Ammann) worked from home (even before Covid).

128. Ammann represented Sharestates at conferences, sometimes its sole representative.

129. The Company directed him to contact certain investors and not others.

130. All of the foregoing makes clear that the Company knew Ammann was functioning as an employee, but nonetheless misclassified him as an independent contractor.

## FIRST CAUSE OF ACTION
### (Breach of Contract – Against Defendant Sharestates)

131.    Plaintiff realleges each of the foregoing allegations as if fully set forth herein.

132.    The parties' September 2016 Agreement is a valid and binding agreement between Plaintiff and Sharestates.

133.    Plaintiff performed under the Agreement.

134.    Sharestates breached the Agreement in numerous ways, including but not limited to by withholding earned wages derived from: (i) all servicing fees, including borrower servicing late fees; (ii) third-party servicing fees, also a type of servicing fees; (iii) so-called "second sales"; and (iv) his contractual entitlement to 10% commission on all loan sales utilizing the warehouse line he secured, as Defendants purported to pay only 2%.

135.    Defendants also wrongfully withhold Ammann's earned wages via the numerous, frequent accounting errors with respect to the Company's calculation of his earned commissions, and the frequent inaccuracies in the monthly Excel spreadsheets. These deductions resulted from, at best, incompetent management and accounting or, in the alternative, and at worst, a purposeful effort to deprive Ammann of his earned commissions.

136.    Ammann is entitled to recover all such wages that, as a result of Defendants' cavalier approach to the calculation of his commissions, have been deducted from his pay.

137.    Moreover, Defendants' improper practices, including but not limited to those described above at paragraphs 104 – 107, violated the Company's implied duty of good faith and fair dealing, a duty implied within every contract in New York.

138.    As a result of Defendants' wrongful conduct, Plaintiff has been damaged in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### (Violation of Labor Law § 193 – Against both Defendants)

139. Plaintiff realleges each of the foregoing allegations as if fully set forth herein.

140. Plaintiff meets the definition of "employee" under Labor Law § 190(2).

141. Both Defendants meet the definition of "employer" under Labor Law § 190(3).

142. The Agreement contains express terms governing the wages that Ammann was to be paid in exchange for his services.

143. As detailed above, Defendants made unauthorized deductions from those wages, including but not limited to by withholding earned wages derived from: (i) all servicing fees, including borrower servicing late fees; (ii) third-party servicing fees, also a type of servicing fees; (iii) so-called "second sales"; and (iv) his contractual entitlement to 10% commission on all loan sales utilizing the warehouse line he secured, as Defendants purported to pay only 2%.

144. Defendants also made unauthorized deductions from Ammann's earned wages via the numerous, frequent accounting errors with respect to the Company's calculation of his earned commissions, and the frequent inaccuracies in the monthly Excel spreadsheets. These deductions resulted from, at best, incompetent management and accounting or, in the alternative, and at worst, a purposeful effort to deprive Ammann of his earned commissions.

145. Ammann is entitled to recover all such wages that, as a result of Defendants' cavalier approach to the calculation of his commissions, have been deducted from his pay.

146. All such amounts constitute earned commissions and earned wages.

147. As a result of Defendants' wrongful conduct, Plaintiff has been damaged in an amount to be determined at trial.[3]

---

[3] To the extent necessary, Plaintiff's claims are asserted in the alternative.

## THIRD CAUSE OF ACTION
### (Violation of Labor Law § 191(1)(c) – Against both Defendants)

148.    Plaintiff realleges each of the foregoing allegations as if fully set forth herein.

149.    Plaintiff meets the definition of "commission salesman" within the meaning of Labor Law § 190(6).

150.    As set forth above, Defendants have failed to pay Plaintiff the wages and commissions earned and payable in accordance with the terms of the parties' Agreement.

151.    Defendants failed entirely to pay certain commissions, and failed to make timely payment of a substantial amount of other earned commissions.

152.    As detailed above, Defendants failed to pay Plaintiff his earned commissions, including but not limited to by withholding earned commissions derived from: (i) all servicing fees, including borrower servicing late fees; (ii) third-party servicing fees, also a type of servicing fees; (iii) so-called "second sales"; and (iv) his contractual entitlement to 10% commission on all loan sales utilizing the warehouse line he secured, as Defendants purported to pay only 2%.

153.    Defendants also failed to pay earned commissions via the numerous, frequent accounting errors with respect to the Company's calculation of his earned commissions, and the frequent inaccuracies in the monthly Excel spreadsheets. These deductions resulted from, at best, incompetent management and accounting or, in the alternative, and at worst, a purposeful effort to deprive Ammann of his earned commissions.

154.    Ammann is entitled recover all commissions that, as a result of Defendants' cavalier approach to the calculation of his commissions, have been deducted from his pay.

155.    All such amounts constitute earned commissions and earned wages.

156.    As a result of Defendants' wrongful conduct, Plaintiff has been damaged in an amount to be determined at trial. In addition to recovering unpaid wages, Plaintiff is entitled to reasonable attorney's fees, prejudgment interest, and "double damages." Labor Law § 191-c.

## FOURTH CAUSE OF ACTION
### (Violation of Labor Law § 198(1-a) – Against both Defendants)

157.    Plaintiff realleges each of the foregoing allegations as if fully set forth herein.

158.    As alleged herein, Defendants willfully withheld Plaintiff's earned wages to which he was entitled under the parties' Agreement, and made unauthorized deductions from those wages.

159.    As a result of Defendants' wrongful conduct, Plaintiff is entitled to recover all unpaid wages, prejudgment interest, reasonable attorney's fees, costs of this suit, and liquidated damages equal to 100% of the total amount of the wages found to be due. Labor Law § 198(1-a).

**WHEREFORE,** Plaintiff requests that the Court grant judgment:

a.    Awarding Plaintiff monetary damages in an amount to be determined at trial (one category of damages alone amounts to $787,081.52 at this time, based on available information);

b.    Awarding Plaintiff, in addition to all unpaid wages due under the parties' Agreement and New York Labor Law, prejudgment interest, reasonable attorney's fees, costs of this suit, and liquidated damages equal to 100% of the total amount of unpaid wages (*see* Labor Law § 198(1-a));

c.    Permanently enjoining Defendant from further violating the terms of the Agreement after the date of judgment by failing to pay Ammann commissions on sales after he "is no longer in the employ of Company" (*see* Agreement, Exhibit A); and

d.    Awarding such other and further relief that this Court may deem just and proper.

Dated: New York, New York
May 17, 2021

**PARKER POHL LLP**

By: _____
David M. Pohl
M. Todd Parker
99 Park Avenue
Suite 1510
New York, New York 10016
(212) 202-8886
(646) 924-3100 (fax)

*Attorneys for Plaintiff*